# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7407 | **DATE** | 11/25/2003 |
| **CASE TITLE** | Gloria Barrientos vs. JoAnne Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Memorandum Opinion and Order entered. Plaintiff's Motion for Summary Judgment to Remand the Case [#27] is hereby granted. Defendant's Motion for Summary Judgment [#30] is hereby denied. *AK*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices 2 | |
| ✓ | Notices mailed by judge's staff. | | NOV 26 2003 | |
| | Notified counsel by telephone. | | date docketed | 34 |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | 11/25/2003 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| | courtroom deputy's initials | | FT | |
| | FT/*aely* | Date/time received in central Clerk's Office | mailing deputy initials | |

United States District Court
Northern District of Illinois
Eastern Division

GLORIA BARRIENTOS,        )
              Plaintiff,  )        No. 00 C ~~7404~~ 7407
                          )
        v.                )
                          )
JO ANNE BARHHART,         )        Magistrate Judge Arlander Keys
COMMISSIONER OF SOCIAL    )
SECURITY,                 )
              Defendant.  )

*DOCKETED*
*NOV 2 6 2003*

## MEMORANDUM OPINION AND ORDER

Plaintiff, Gloria Barrientos, moves this Court for Summary
Judgment pursuant to Rule 56(a) of the Federal Rules of Civil
Procedure, to reverse or remand the final decision of the
Commissioner of Social Security, denying her claim for Disability
Insurance Benefits ("DIB"). 42 U. S. C. §405(g) (2003).
Defendant has filed a Cross-Motion for Summary Judgment, asking
this Court to affirm the Commissioner's final decision. For the
reasons set forth below, Plaintiff's Motion is granted, and the
case is remanded to the Commissioner for further proceedings
consistent with this opinion.

### Procedural History

Plaintiff first filed for DIB on May 22, 1989. On September
26, 1990, administrative law judge ("ALJ") Richard F. Sprague
found Plaintiff disabled for the period February 11, 1988 through
May 10, 1990. (R. at 319-31.) ALJ Sprague found that Plaintiff
could not return to her past work, but was capable of performing

34

"light" exertional work after May 1990. (R. at 329.) Plaintiff requested review of ALJ Sprague's decision by the Appeals Council, which denied review and upheld the ALJ's ruling, making the ALJ's opinion the final decision of the Commissioner. Plaintiff appealed the decision to the District Court. On September 2, 1992, Judge James R. Holderman of the United States District Court for the Northern District of Illinois affirmed the Commissioner's decision. (R. at 432.)

Plaintiff filed a second application for benefits on June 18, 1992, claiming that she was totally disabled for the period after May of 1990. On February 17, 1993, the Social Security Administration ("SSA") denied Plaintiff's second application for DIB. (R. at 435, 445.) Plaintiff did not appeal this decision. (Id.)

On August 17, 1993, Plaintiff filed a third application for DIB. (R. at 447-50.) The SSA denied the third filing on February 8, 1994, and again upon reconsideration on May 6, 1994. Plaintiff submitted a Request for Hearing on June 1, 1994, and on February 14, 1995, had a hearing before ALJ Carolyn Cozad Hughes. (R. at 46-98.) At the hearing, Plaintiff, her ex-husband, her daughter, and a vocational expert ("VE") testified. (Id.) The ALJ considered only whether Plaintiff was disabled after May 11, 1990 -- the date that ALJ Sprague had found Plaintiff could perform light work. (R. at 21-30.)

Like ALJ Sprauge before her, ALJ Hughes found that Plaintiff was able to perform light work involving lifting up to 20 pounds occasionally, and up to 10 pounds frequently. (R. at 28-9.) Because Plaintiff was capable of performing light work, the ALJ concluded that Plaintiff was not disabled under Vocational Grid Rule 202.10. *See* 20 C.F.R. pt. 4040, Subpt. P, App.2, Table No 2. (R. at 28.) In reaching her conclusion, ALJ Hughes neglected to mention or rely upon VE Dunleavy's testimony.[1] She also did not address the availability of jobs to Plaintiff given her physical limitations, educational background, and work experience.[2] (*See* Testimony R. at 88-96.) ALJ Hughes also found that Plaintiff's insured status had expired on December 31, 1993, which precluded Plaintiff from being declared disabled upon turning 55, in 1995. (R. at 28.)

---

[1] VE Dunleavy testified that a 54 year old person with a ninth grade education, able to perform light work but, with one third less flexibility in the cervical spine, would be able to work in about 10,000 to 15,000 cashiering jobs in the Chicago region. (R. at 91-2.) However, the VE further testified that, if this hypothetical person could not do repetitive motions with her dominant right hand, she would be precluded from such jobs. (R. at 92.)

[2] *See* 20 C. F. R. 404.1520(a)(4)(v), which requires the residual functional capacity ("RFC"), education, and work experience of a claimant to be considered to assess whether the claimant can make an adjustment to other work. *Also see DeFrancesco v. Bowen*, 867 F.2d 1040, 1045 (7th Cir. 1989)(ALJs should "get off their grids" and hear testimony by a VE to determine whether there are enough jobs for the claimant, instead of relying on mechanical rules in the regulations.)

3

Plaintiff filed a timely request for review with the Appeals Council, which was denied in February of 1997. Plaintiff filed suit in the District Court on April 15, 1997. Judge Milton I. Shadur remanded the case to the Commissioner, to recalculate Plaintiff's date last insured. On August 19, 1998, the Appeals Council vacated ALJ Hughes' determination, and referred the case to ALJ John L. Mondi to determine the correct dates of coverage. In addition, the Appeals Council directed ALJ Mondi to reopen the hearing in order to assess new evidence of disability. (R. at 727-28.) The Appeals Council also authorized the ALJ to seek VE testimony to determine what, if any, work Plaintiff could have performed during the claimed period of disability. (*Id.*) The Appeals Council specifically required the ALJ to "cite the evidence which supports each conclusion as to Plaintiff's residual functional capacity and . . . explain how any material inconsistencies or ambiguities were resolved." (*Id.*)

ALJ Mondi held a hearing on June 22, 1999, at which Plaintiff, her ex-husband, her adult daughter, and VE Clifford Brady testified. ALJ Mondi issued his partially favorable ruling on November 16, 1999. (R. at 790-801.) In his opinion, the ALJ found that, upon attainment of age 55 on August 9, 1995, and pursuant to the appropriate regulations triggered by age, Plaintiff was disabled. (R. at 797-98, ¶¶ 8-12.) However, the ALJ found that Plaintiff was able to do light work prior to her

4

55th birthday and, hence, was not disabled during the period in dispute -- May 11, 1990 to August 9, 1995.[3] (R. at 798, ¶ 12.)

Plaintiff appealed the unfavorable portion of the decision to the District Court, and requested a copy of the hearing transcript. The Commissioner could not locate the tapes, and moved to dismiss the case and remand it for a *de novo* hearing. (Def.'s Mot. Dismiss ¶5.) The case was remanded and the Appeals Council reassigned it to ALJ Mondi on July 10, 2001. The ALJ held another hearing on January 15, 2002, and rendered his decision on June 19, 2002, reaching the same conclusions as his prior order. (R. at 656-726.) Upon rejection of her appeal, Plaintiff filed the present action on June 27, 2003.

### Factual Background

**I. Summary of the Facts**

As shown in the procedural history, this case has a long history. The administrative record for the case exceeds 800 pages. Hence, a brief summary of the issues will be useful before details of the records are discussed.

The basic facts in the case are not in dispute. Gloria Barrientos was born in August of 1940, she has a ninth grade education, and worked on a packing line at a liquor manufacturer

---

[3] The Commissioner admits that the hearing tape from the June 22, 1999 hearing cannot be located. *See* Declaration of Olga Kelley of the Social Security Administration attached to Def.'s Mot. Dismiss (Mar. 1, 2001).

for about twelve years. Her last job required the Plaintiff to pack bottles in cases, push the cases, and lift up to 65 pounds. In 1988, she injured her back at work. Her physician, Dr. Stephen Holper, ordered her to stay home from work and eventually declared her totally disabled. A series of therapeutic and consultative visits to various health facilities and doctors followed. After Plaintiff filed for workers' compensation and disability payments, the Illinois Department of Rehabilitation Services and the SSA referred her to a number of physicians for independent medical examinations. The SSA declared her disabled from her date of injury through May 1990, but ruled that she could perform light work after that date. Eventually, as the case wound itself through various hearings and appeals, Plaintiff reached her 55th birthday, which rendered her disabled under the Social Security Regulations ("SSR"), even though the Commissioner found her able to perform light work.[4]

A dispute remains, however, as to whether she was disabled prior to age 55, specifically for the period of May 10, 1990, (which was ruled to be the end of her approved disability) and August 9, 1995, (Plaintiff's 55th birthday). The record contains conflicting medical opinions concerning the extent and

---

[4] Under Social Security Regulations, 55 is defined as "advanced age" and combined with her limited educational background and unskilled level of her employment history, qualified her as disabled. See 20 C.F.R Pt 404, Subpt. P. App. 2, Rule 202.01.

continuation of her injury. There is also a dispute as to whether there were jobs in the regional economy for someone with Plaintiff's limitations, education, and work experience.

The hearings conducted by ALJ Mondi in June of 1999, and again in January 2002, were to determine whether: (1) Plaintiff was capable of performing light work during the period in dispute; and (2) given her physical impediments, education and work experience, there were jobs available to her in the regional economy. *See* 20 C.F.R. 404.1520(a)(4)(v). Following both hearings, ALJ Mondi found that Plaintiff was able to do light work during the period in dispute, and that jobs were available to her in the regional economy.

**I. Medical History**

Plaintiff's relevant medical history is long, and is documented by numerous medical reports and files. Since the Commissioner concedes that Plaintiff was disabled between February of 1988 through May 10, 1990, the relevant medical evidence is for the period after May 10, 1990 through the date of Plaintiff's 55th Birthday (when, under the regulations, Plaintiff became disabled.) Nevertheless, the Court will briefly review Plaintiff's entire medical history to present an adequate picture of Plaintiff's condition.

## A. Treating Physicians and Plaintiff's Consulting Physicians

### (i) Dr. Steven Holper

When Plaintiff was injured at work on February 11, 1988, she first saw Doctor Steven Holper at Midway Medical Services, Ltd. Dr. Holper ordered Plaintiff to rest, and provided disability certificates for her for her employer. (R. at 227-31.) In his initial report, which he filed two weeks after Plaintiff's injury, Dr. Holper noted that Plaintiff had decreased dynamics of the spine, altered sensation on the right, and loss of grip strength on the right, but that there was no evidence of fracture, dislocation, or abnormal cervical lordosis on the X ray. (R. at 232.) Dr. Holper diagnosed acute spine sprain, with myofibrositis, and myofascial pain syndrome. (*Id.*)

In progress reports filed later, Dr. Holper noted that Plaintiff was suffering from pain, and that she had "a proclivity toward permanent injury." In order to avoid permanent injury, Dr. Holper conditioned her return to work on the understanding that she would lift no more than 5 lbs., not raise her hands or arms above her shoulders, no repetitive twisting, and no long periods of standing. (R. at 234.) With those conditions, Plaintiff returned to work on March 29, 1988.

The next day, Plaintiff's employer determined that there was no work available for Plaintiff (R. at 237), and referred her to a physician at the Kildare Clinic for a consultive examination.

8

This physician reached the same diagnosis as Plaintiff's physician, Dr. Holper[5]. (*Id.*) The record shows a series of interim reports by Dr. Holper confirming his initial findings (R. at 147, 196, 496.), as well as progress reports on her physiotherapy and vocational retraining (R. at 270-75.)

### ii- Dr. Benjamin Narranjos

Dr. Narranjos took over from Dr. Holper upon the latter's departure from the Midway Medical Services Clinic. In September of 1993, Dr. Narranjos summarized Plaintiff's history of treatment with Dr. Holper. Without identifying specific treatments, tests or results, Dr. Narranjos informed the Illinois Department of Rehabilitation Services that Plaintiff was, in his opinion, permanently disabled. (R. at 536-37.) On March 24, 1994, Dr. Narranjos reiterated his view that Plaintiff was disabled. (R. at 553-73.) In a note dated February 7, 1995, Dr. Narranjos again opined that Plaintiff was unable to engage in any gainful employment. (R. at 600-02.)

### (iii) Dr. Barry Fischer

On May 14, 1993, Dr. Barry Fischer stated that he had examined the Plaintiff, and noted that she had complained of pain and having difficulty with twisting and bending. (R. at 531-34.) Dr. Fischer performed examinations and X-rays, and found marked

---

[5]    The employer also referred Plaintiff to Dr. Shafer for a consultative examination. (R. at 242.) Dr. Shafer's report is summarized in the referral physicians section below.

reduction in motion of the cervical spine, and some loss of normal cervical ordotic curvature. (R. at 532-33.) In addition, he found a causal connection between her myofacial pain syndrome and the injury suffered in 1988. (R. at 534.) He stated "this condition has now reached a permanent state." (Id.)

### (iv) Other Doctors

Plaintiff saw Dr. Robinson in August of 1994 and January of 1995, complaining of diarrhea, chest pain, and congestion. (R. at 605.) Dr. Robinson authorized prescriptions for Demerol and Paxil for Plaintiff's pain and to alleviate her symptoms. (Id.) In 1995, Dr. Marquis performed a psychiatric evaluation of Plaintiff, and observed no psychiatric impairment, but noted that Plaintiff suffered from mild depression. (R. at 610-11.) A physical therapist's report, dated August 30, 1995, observed extreme weakness, noting that Plaintiff could lift no more than 10 pounds, and limiting Plaintiff to sedentary work. (R. at 638-39).

## B. Referral Physicians

### (i) Dr. Shafer

Plaintiff's employer also referred her to Dr. Shafer. Dr. Shafer examined Plaintiff on May 2, 1988, and found good cervical spine motion, albeit with complaints of aching at the extremes. (R. at 170-72) He also noted a vague soreness in the long cervical muscles. (Id.) He opined that Plaintiff appeared to

have overuse or overstress syndrome, but he thought a gradual return to work was possible. (*Id.*)

### (ii) Dr. Gleason

On July 25, 1988, Dr. Thomas Gleason, an orthopedic surgeon retained by the Hartford Insurance Company, stated that, upon examining the Plaintiff, he observed normal cervical lordosis and thoracic kyphosis, and found that motion of the cervical spine was limited in extension as well as in lateral rotation and lateral bending, more so on the left than right. (R. at 183-86.) He also observed that Plaintiff's movement of her shoulders, elbows, wrists, and digits were entirely normal. (*Id.*) Dr. Gleason recommended that physical therapy, injections, and chiropractor treatment be stopped. (*Id.*) He also recommended that the application of a TENS unit be discontinued, and that Plaintiff be evaluated for work capacity, with a possible return to work. (*Id.*)

On August 17, 1993, which is during the period in dispute, Dr. Gleason reported to the Hartford Insurance Company that he had examined Plaintiff for the second time in July of 1993. Dr. Gleason recommended a neurological examination, because he was uncertain as to how much of the pain was related to physiologic, as opposed to psychogenic, factors. (R. at 535.)

### (iii) Dr. Hari Agrawal

At the request of the Hartford Insurance Company, Dr. Hari
Agrawal examined Plaintiff on October 26, 1988. (R. at 138-43.)
Dr. Agrawal found that, despite the physical therapy and use of a
TENS unit since her injury, Plaintiff had severe limitations in
cervical spine motion in all directions, especially in flexion
and in rotation. (*Id.*) Dr. Agrawal noted that Plaintiff was
crying during the examination. (*Id.*) The doctor recommended a
series of tests, as well as a chronic pain program. (*Id.*)

### (iv) Dr. Leonard Smith

In early 1990, the Illinois Department of Rehabilitation
Services referred Plaintiff to Dr. Leonard Smith, an orthopedic
surgeon, for an independent examination. On May 11, 1990, Dr.
Smith opined that there was "little objective evidence in
relation to her subjective complaints." (R. at 304-305.) Dr.
Smith noted, however, that he had not seen any X-rays and
recommended an EMG of Plaintiff's neck and upper extremities to
"properly" examine the cause of her complaints. (*Id.*)

Two days later, on May 13, 1990, Plaintiff was admitted to
Christ Hospital's emergency room for back pain. (R. at 506-13.)
X-rays revealed minimal degenerative changes, but loss of normal
lordotic curve due to spasm. (R. at 510.)

### (v) Dr. Leonard Slavick

On June 9, 1990, Dr. Slavick, a neurologist, also examined Plaintiff at the request of the Illinois Department of Rehabilitation Services. (R. at 308-13.) Dr. Slavick reported that the result of anEMG/NCV study was entirely normal. (*Id.*) However, Dr. Slavick found multiple tender muscular spasms over the cervical and thoracic paraspinal muscles, and a reduction in neck rotation by 10 degrees in both directions, leading him to conclude that Plaintiff was suffering from cervical and thoracic myofascitis. (*Id.*)

### (vi) Dr. B. Murthy

Upon referral by the Illinois Department of Rehabilitation Services, on December 10, 1992, Dr. B. Murthy, a consulting internist, reported on his examination of Plaintiff. (R. at 516-19.) Dr. Murthy found decreased normal lumbar lordosis, limited ventral movements, and noted that the cervical spine showed tenderness over the C6-C7 areas. (*Id.*) He noted that the patient was crying due to pain during the examination. (*Id.*) He found evidence of crepitus in both knee joints and the right ankle, as well as evidence of Heberden's nodes over both hands. (*Id.*) Dr. Murthy opined that Plaintiff suffered from myofascial syndrome in the cervical spine, and had mild degenerative disease in the joints. (*Id.*)

On November 29, 1993, Dr. Murthy, examined Plaintiff for a second time at the request of the State of Illinois Department of Rehabilitation Services. (R. at 538-41.) He found her to have chronic cervical strain, and observed objective evidence of carpal tunnel syndrome in the right hand, a suggestion of chronic lumbosacral strain, and varicose veins. (Id.) Dr. Murthy also reported that Plaintiff complained of fecal and urine incontinence. (Id.)

### (vii) Dr. Echiverri

On December 21, 1993, Dr. Echiverri, a neurologist, evaluated Plaintiff's file and concluded that she had a chronic sprain/strain to the cervical and lumbar spine, severe myofascial pain syndrome, with significant muscle de-conditioning, and a right shoulder pathology. (R. at 545-46.) He recommended an EMG/Nerve conduction study, and a possible epidural spinal cord stimulation. (Id.) In his report, Dr. Echiverri noted: "we cannot . . . rule out once and for all the possibility of cervical radiculopathy . . . and it is quite common for a radiculupathy to be accompanied by shoulder pathology." (R. at 546.)

### (viii) Dr. Girzadas

On June 7, 1995, Dr. Girzadas, an orthopedic consultant for the Illinois Department of Rehabilitation Services, found no evidence of paravertebral spasm, and a normal and full range of

14

motion, but observed Plaintiff crying from pain during the examination. (R. at 616-19.) He diagnosed a probable chronic cervical strain, tendonitis of the right shoulder, chronic right ankle pain, and a large firm ganglion on her left wrist. (Id.)

### (ix) Residual Physical Function Capacity Assessments by Referral

On January 5, 1993, Dr. Rachel Gotanco completed a Residual Physical Function Capacity Assessment form on Plaintiff. (R. at 523-30.) Dr. Gotanco concluded that "most of the limitations in the RFC are due to the pain. Though AP [attending physician] states that claimant is unable to do any work, objective findings . . . indicate that claimant can do a limited range of light work." (Id.)

On April 15, 1994, doctors Jose Gonzalez, and Julius Villaflor completed a Residual Physical Capacity Assessment form, and found that Plaintiff was capable of lifting up to 20 pounds occasionally and 10 pounds routinely, and that she could stand up to six hours in an average workday. (R. at 574-81.)[6]

## II. Testimony at the January 15, 2002 Hearing

At the January 15, 2002 hearing before ALJ Mondi, Plaintiff, her ex-husband, her daughter, and VE James Radke each testified. (R. at 684-701.) The following is a summary of their testimony

---

[6] Because the SSA determined that Plaintiff was disabled as of 1995, the Court has not discussed the medical evidence compiled after that date.

## A. Plaintiff's Testimony

Plaintiff testified that she currently lives with both her ex-husband and her adult daughter. Plaintiff testified that she is in almost constant pain, and takes over the counter medicine for relief. (R. at 690.) She explained that she cannot take aspirin or heavy prescription pain drugs, because they upset her stomach and she has a tendency to get diarrhea. (*Id.*) She testified that she has chronic diarrhea and continued incontinence. (*Id.*) She further testified that she has worn elastic bands on her wrist and ankle to cope with her continual pain (R. at 692), and that, since 1990 or 1991, she spends most of the day on a recliner with heat and massage functions (R. at 690, 708).

Plaintiff testified that she changed doctors because of a lapse, and later a change, in her health insurance coverage. (R. at 693). Plaintiff also testified that her injections and prescription drugs did not relieve her pain and gave her stomach problems (R. at 713), that she had no medical insurance from 1990 to 1995, and that she paid for the medications herself (R. at 714).

## B. Plaintiff's Ex-Husband's Testimony

Plaintiff's ex-husband, Robert Stanko, testified that Plaintiff has had long-term pain problems. (R at 697.) He estimated that, by 1996 or 1997, Plaintiff was a "couch potato." (Id.) Mr. Stanko testified that Plaintiff was in pain as far back as 1991, and that the pain made her irritable, unable to sleep, and constantly fidgety in bed. (R. at 702.) He also confirmed his ex-wife's testimony in a 1990 hearing that she could sleep for no more than two hours at a time. (R. at 705.)

## C. Plaintiff's Daughter's Testimony

Plaintiff's daughter, Cheryl Corso[7], testified that she began living with her mother about seven and half years prior to the date of the hearing. (R. at 698-99.) Upon her arrival, her mother had stopped vacuuming and doing heavier household chores altogether. (Id.) Ms. Corso testified that she had visited her mother frequently before moving in with her, and at least a year prior to moving in, approximately in 1994, her mother had problems sleeping and getting relief from the constant pain. (R. at 701.)

## D. Vocational Expert James Radke's Testimony

At the hearing, the ALJ posed a series of hypothetical questions to the VE, James Radke. (R. at 715-23.) First, the ALJ

---

[7] Some of the documents in the record refer to Plaintiff's daughter as Cheryl Korso.

asked whether a person between the ages of 50 and 55, who was able to do light work, with limitations prohibiting climbing ropes and scaffoldings, but allowing occasional climbing of ladders, ramps, stairs, as well as occasional stooping and crawling, but without concentrated exposure to extreme temperatures, humidity, and dust could return to Plaintiff's previous work or find alternative employment. (R. at 715-16.) The VE testified that the person would not be able to perform Plaintiff's previous work, but opined that, without vocational adjustments, the person could be a candidate for over 12,300 packaging and filling jobs in the region. (R. at 718.)

In the second scenario, the ALJ added additional limitations for the hypothetical person by restricting overhead reaching with the right shoulder, and lifting no more than 5 pounds. (R. at 718-19.) The VE opined that there would be no job for such a person without "considerable vocational adjustment." (R. at 719.) In the third hypothetical, which in addition to the limitations imposed in the first hypothetical, included the inability to walk more than two blocks, the VE also found no prospect of work for the person. (Id.) The VE also opined that if the testimony of Plaintiff and her husband and daughter were fully credited, Plaintiff would not be capable of competitive employment. (R. at 720.)

Plaintiff's attorney then proposed a series of additional limitations to the hypothetical person, such as limitations on the use of the right hand for repetitive work, limitations in fingering or pushing, or the need to take frequent bathroom breaks. (R. at 720-22.) In each case, the VE testified that there were no jobs available for such person.

### III. The June 19, 2002 Decision of ALJ Mondi

Notwithstanding the *de novo* nature of the hearing, ALJ Mondi referenced his previous decision, which was vacated voluntarily by the Commissioner and the Appeals Council. (R. at 660.) The ALJ relied on testimony offered by Plaintiff and her family at the June 1999 hearing (whose tapes are missing) in support of his decision.[8]

The ALJ found that "the record is noteworthy for a paucity of abnormal medical findings despite the five-year period being considered." (R. at 660.) He also noted that Plaintiff "has never undergone hospitalization for her allegedly disabling symptoms. Nor has she taken prescriptive pain medications for many years." (*Id.*)

ALJ Mondi also rejected labeling Dr. Narranjos as Plaintiff's treating physician, in light of the infrequent visits

---

[8]At the January 2002 hearing, Plaintiff's attorney specifically raised the issue that the ALJ's previous (and vacated) decision was based on improper interpretations of the testimony heard in the unrecorded previous hearing. (*See* Testimony section on Record at 659.)

to the doctor, and no evidence of his treatment notes. (R. at 661.) Further, he noted that there was no documentation of her 26 injections allegedly ordered by Dr. Holper, the physician before Dr. Narranjos. (*Id.*)

The ALJ found that, neither the record nor the testimonies make a case for depression or psychiatric malady. (R. at 662.) He also found that, notwithstanding Plaintiff's lack of insurance, Plaintiff could have sought public aid for her pain medication, but she did not. (*Id.*)

With regard to Plaintiff's ability to find work, given her impairments, the ALJ ignored VE Radke's testimony, and instead incorporated the testimony of a different VE, Clifford Brady, who had testified at Plaintiff's June 22, 1999 hearing. (R. at 663.) Notably, the Commissioner was unable to locate a transcript or tape of this hearing, and therefore, the Commissioner vacated ALJ Mondi's November 16, 1999 decision based on that hearing.

ALJ Mondi found that Plaintiff had myofascial pain syndrome, which significantly limited her ability to perform basic work, but that it was not severe enough to render her disabled. (R. at 664.) ALJ Mondi found the testimony of Plaintiff's husband and daughter credible as to the worsening of her condition, but not credible as to Plaintiff's inability to do light work. (*Id.*) The ALJ found Plaintiff's allegations of disabling symptoms and limitation not credible. (*Id.*) He also found that Plaintiff had

the residual functional capacity to perform the requirements of light work through at least August 9, 1995 (her 55th birthday). (*Id.*) He also found that, prior to her 55th birthday, jobs existed in significant numbers which she could have performed. (*Id.*)

## Standard of Review

In reviewing the ALJ's decision, the Court may not decide the facts, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan* 912 F.2d 178, 181 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible). Rather, the Court must accept findings of fact that are supported by "substantial evidence,",42 U.S.C. §405(g), where substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron,* 19 F.3d at 333 (quoting *Richardson v. Perales*, 403 U.S. 389, 401 (1971).)

This does not mean that the Commissioner (or the ALJ) is entitled to unlimited judicial deference, however. An ALJ must sufficiently articulate his assessment of the evidence to "assure us that the ALJ considered the important evidence . . . [and to

enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). When the ALJ fails to mention rejected evidence, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Zblewski v. Schweiker*, 732 F.2d 75, 78-79 (7th Cir. 1984) (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir.1981) that such explanation is absolutely essential for meaningful appellate review.)

Further, while the Court does not require a written evaluation of every piece of testimony and evidence submitted, a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position. *Zblewski* at 78-79. And finally, the evidence supporting the agency's decision must be substantial "when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [agency's] view." *Id.* at 78 (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 472, 477-78 (1951) )(where substantial evidence in favor of the agency's decision cannot be determined in isolation from the aggregate record.)

## SOCIAL SECURITY REGULATIONS

The Social Security Regulations (the "Regulations") prescribe a five-step sequential analysis to determine whether a claimant is disabled. 20 C.F.R. §404.1520 (2003). The ALJ must

22

consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or medically equals any impairment listed in the Regulations as being so severe as to preclude gainful activity; (4) is unable to perform her past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); 20 C.F.R. §404.1520 (2003). A negative answer at any step other than step three precludes a finding of disability. *Id.* At 389. The Plaintiff has the burden of proof at steps one to four. *Id.*; *Balenton v. Halter*, 156 F. Supp. 2d 776, 782 (N.D. Ill. 2001). If the claimant's burden is met, the burden shifts to the Commissioner at step five to show that claimant has the ability to engage in other work existing in significant numbers in the national economy. *Young*, 957 F.2d at 389; *Balenton*, 156 F. Supp. 2d at 782.

### Discussion

In the process of reviewing Plaintiff's application, the Commissioner committed a number of errors, which have contributed to over ten years of litigation and hearings. The miscalculation of the eligibility period for disability required a remand by the District Court in 1998, then the loss of the tape and/or transcript of the June 22, 1999 hearing forced a *de novo*

23

hearing and decision. This Court finds that, once again, the ALJ committed significant errors in rendering the Commissioner's most recent decision. And while it is tempting to put this matter to rest, the law is settled that, in the absence of a complete lack of supportable evidence for the Commissioner's position, the Commissioner shall make the decision on the totality of the record. See *Campbell v. Shalala*, 988 F.2d 741, 743-44 (7th Cir. 1993) (remand is appropriate unless the record is so clear that it could yield but one supportable conclusion); *Prince v. Sullivan*, 933 F.2d 598, 603 (7th Cir. 1991) (whether plaintiff should be awarded or denied benefits is a factual determination best left to the Commissioner, unless the record can yield but one supportable conclusion). The record in this case does not justify the Court reversing this matter outright.

Remand, however, is warranted. On August 19, 1999, the Appeals Council directed the ALJ to review Plaintiff's claim at a *de novo* hearing. (R. at 727-28.) The Appeals Council required the ALJ to "cite the evidence which supports each conclusion as to Plaintiff's residual functional capacity" and "explain how any material inconsistencies or ambiguities were resolved." The ALJ failed to address any of the Appeals Council's specific mandates. The ALJ neither based his decision on a *de novo* hearing, nor specifically cited the evidence supporting his Residual Functional Capacity determination.

Finally, the ALJ's decision does not clearly explain how inconsistencies or ambiguities were resolved in reaching the final decision. As a result, this Court is unable to address Plaintiff's contention that the ALJ erred by: (1) finding Plaintiff to do light work prior to age of 55; (2) playing doctor; and (3) making improper credibility assessments. Therefore, the Court has no alternative but to remand the case for a de novo hearing before a new ALJ, and a decision consistent with the requirements of the SSRs and the precedents in this Circuit.

**A. The ALJ's Failure to Conduct and Rely Upon a De Novo Hearing**

It is undisputed that the Commissioner directed ALJ Mondi to conduct a de novo hearing, after it was discovered that the tapes from Plaintiff's prior hearing were missing. *See* Def. Mot. Dismiss. ¶5 (March 1, 2001). Despite this mandate,, ALJ Mondi referred to the January 15, 2002 hearing as a "supplemental hearing." (R. at 668.) Plaintiff's counsel objected, noting that Plaintiff was entitled to a de novo hearing. (R. at 670-71.) The ALJ acknowledged that the prior decision was vacated, and stated that he had no objection to the Appeal Council's decision. (R. at 672.)

Notwithstanding the above, in his June 2002 findings, ALJ Mondi makes repeated references to his own prior order, which was, in part, based on testimony no longer in the record, as well

as the prior decisions of the other ALJs. (R. 658-65.) A simple definition of a de novo hearing is "[A] hearing of a matter, conducted as if the original hearing had not taken place." *Black's Law Dictionary* (7th ed. 1999). In this regard, there are two problems with the ALJ's approach: 1) incorporating the prior vacated decision into the new decision; and 2) relying upon VE testimony from a previous hearing, which was no longer part of the record.

The first and more important problem is the ALJ's extensive reliance upon his impressions and recollections from the June 1999 hearing. The ALJ uses his written opinion as a reference to non-verifiable hearing testimony from Plaintiff, her ex-husband, and her daughter as to when Plaintiff first experienced physical problems in doing housework and shopping. (R. at 659.) Plaintiff's attorney labels the ALJ's impressions as misunderstandings, and is frustrated in challenging the ALJ's conclusions because, as Defendant concedes, Defendant lost the tapes from the hearing. (Pl's Mot. S. J. at 22 (June 27, 2003). The Court agrees that the ALJ's reliance upon this unverifiable prior testimony in a de novo review is inappropriate and requires remand.

Also problematic is the ALJ's presumed rejection of VE Radke's January 2002 testimony in favor of testimony offered by VE Brady at Plaintiff's June 1999 hearing. (R. at 663.) Not

only was the ALJ's reliance upon the prior testimony
inappropriate (for the reasons discussed above) but the ALJ does
not attempt to reconcile the conflicts between VE Brady and VE
Radke's opinions.

Specifically, in the vacated November 1999 decision, ALJ Mondi
wrote:

> outlook for a hypothetical person having Plaintiff's
> age, educational background, employment history, and
> right handedness.  If the individual also had the
> ability to perform light work involving only occasional
> stooping, climbing, balancing, but was unable to do
> sustained repetitive work with her right hand, the
> vocational expert testified that the person could not
> perform past distillery factory work, but could perform
> approximately 50% of the light jobs found in the
> Chicago Metropolitan area … [i]f there was also
> incontinence or coughing, the impact could depend on
> the frequency: if only a few times a day … would not
> have any significant effect on the jobs cited.  Mr.
> Brady also testified that an inability to raise the
> right arm above shoulder-level would not have any
> impact on the jobs cited."  (R. 796).

At the January 2002 hearing, the ALJ posed a hypothetical
to VE Radke, describing a person between 50 to 55 years old,
unable to climb, but able to occasionally stoop and crawl, and
asked the VE whether there were any employment opportunities for
the hypothetical person.  (R. at 717-18.)  VE Radke responded
that, while the person would not be able to do the original work,
she could do a variety of light tasks.  (*Id.*)  However, when the
ALJ added limited overhead reaching and a 5-pound weight lifting
limitation, the VE responded, "there are no other positions

available within the regional economy that would not require a considerable vocational adjustment." (R. at 719.) VE Radke further testified that an inability to raise the arms above the head, and the need for frequent bathroom breaks were both detriments to the person's ability to find employment. (R. at 720-22.)

Clearly, VE Radke and VE Brady's testimony conflict as to whether Plaintiff could find employment. The ALJ erred by relying upon VE Brady's testimony – which is not part of the record – without even attempting to reconcile it with VE Radke's testimony.

The only explanation the ALJ offers in ignoring the testimony of VE Radke is, at best confusing, and at worst erroneous. The ALJ states:

> Since the medical vocational rules apply and are controlling, it is not necessary to consider the vocational expert's response to the corresponding hypothetical question at the January 2002 hearing. However, the testimony of the vocational expert at the hearing on June 22, 1999 as summarized in the prior decision is incorporated by reference into this decision."

(R. at 663.)

The ALJ committed an error of law. Reference to the vocational rules, without applying them to the circumstances of the individual claimant, is not acceptable in this Circuit. In *DeFrancesco v. Bowen*, 867 F.2d 1040, 1043 (7th Cir. 1989), the

plaintiff was found able to do light work, and the ALJ ruled
that, on the strength of the Medical-Vocational Grid, Plaintiff
was not disabled. The 7th Circuit reversed, relying on SSR 83-
12, which provides that "where the extent of erosion of the
occupational base is not clear, the adjudicator will need to
consult a vocational resource" (meaning a VE). *Id.* at 1045.
Judge Posner observed that, while the Medical-Vocational Grid
brings uniformity to adjudications, it has the characteristics of
any mechanical rule. *Id.* However, Judge Posner further observed
that the Social Security Administration has chosen not to rely on
purely mechanical application of the rules, but has advised the
ALJs to "get off their grids and hear testimony by a vocational
specialist concerning whether there are enough jobs that *this*
claimant can *actually* do to warrant a conclusion that his medical
condition is not totally disabling." *Id.* (Emphasis in original.)

The second sentence of the quoted language is also puzzling.
Since both experts addressed the hypothetical about a worker
between 50 and 55 years of age, the Court is bewildered as to why
the ALJ found that VE Radke's testimony was unnecessary, but that
VE Brady's testimony should be incorporated. The only difference
between the testimonies that this Court can ascertain is that the
ALJ got the answer he wanted in one and not the other. Aside
from relying on testimony which is not part of the record, and on
a decision which had been vacated, the ALJ committed the error of

selectively relying on testimony that supports his decision, and rejecting testimony that supports Plaintiff's position, without properly explaining why. *See Herron*, 19 F.3d at 333 (ALJ may not select and discuss only that evidence that favors his ultimate conclusion.)

## B. Resolution of Ambiguities or Conflicts in the Record

One of an ALJ's fundamental tasks is to resolve conflicting medical evidence to arrive at the facts. ALJ Mondi's June 2002 decision does not provide this Court with any indication as to how the conflicting evidence was resolved. (See *Stephens v Heckler*, 766 F.2d 284, 288 (7th Cir. 1985) (An ALJ must sufficiently articulate his assessment of the important evidence to allow the court to trace of his reasoning.)

In this case, the ALJ states that there is a "paucity" of objective medical evidence in support of Plaintiff's claims of pain and limitations. (R. at 660.) While the evidence presented contains conflicting medical opinions, both Plaintiff's treating physicians and various consulting physicians supplied opinions and reports supporting Plaintiff's claim of disability. *See, e.g.,* Dr. Slavick's Report, R. at 308-13; Dr. Murthy's Report, R. at 516-19, 538-41; and Dr. Echiverri's Report, R. at 545-46. The ALJ neither relied upon this evidence nor explained why he rejected it. *Brindisi v. Barnhart,* 315 F.3d 783, 786 (7th Cir. 2003) (the ALJ's failure to discuss the strongest piece of

evidence supporting the plaintiff's claim required remand.) As such, it is impossible for the Court to determine whether the ALJ's decision is supported by substantial evidence. *Smith v. Apfel,* 231 F.3d 433, 438 (7th Cir. 2000).

The ALJ's June 2002 decision also mentions that there was no objective evidence of 26 shots of cortisone allegedly ordered by Dr. Holper, or of frequent visits to Dr. Narranjos during the five-year period in dispute. (R. at 661). The record does contain evidence of at least 21 injections billed and paid for by the insurance company. (R. at 167, 189, 190, 292). Dr. Narranjos, stated that he replaced Dr. Holper upon the latter's departure from the clinic. (R. at 602). As to her infrequent doctor visits, Plaintiff testified that during the five-year period in dispute, she had no health insurance coverage (R. at 714), and that none of the treatments and medicines seemed to help her condition. (R. at 713). In addition, her long time physician, Dr. Holper, left the clinic in 1992. These two factors present a plausible explanation as to why Plaintiff did not frequently visit a physician, and yet the ALJ does not address these factors. *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996) ("we cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do

not build an accurate and logical bridge between the evidence and the result.")

The ALJ appears to find fault with Plaintiff not being hospitalized for her pain, and not pursuing sources of free medications. (R. at 662.) This Court notes that case law is not completely in accord with the ALJ's position. See *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000) (that the plaintiff has been taking only over the counter pain killers cannot be compelling evidence of the lack of severity of pain, since heavy pain killers often have serious side effects or are addictive); see generally *Rohan v. Chater*, 98 F.3d 966 (7th Cir. 1996) (the ALJ put too much significance on plaintiff's lack of in-patient treatment, despite the patient's ability to pay for treatment, and ignored objective medical evidence and substituted his judgment for that of medical experts); and *Pilarczyk v. Sullivan*, 803 F. Supp. 1317, 1324 (N. D. Ill. 1992) (lack of supporting medical evidence for pain shall not be the sole reason for dismissing the subjective claim). Therefore, the Court finds that the ALJ erred by dismissing Plaintiff's claim of pain on this basis alone- particularly without any discussion as to why he rejected Plaintiff's explanations.

On the whole, the decision of the ALJ is very short on analysis of the medical evidence, and long on conclusory statements, without support from the record. The problem is not

limited to the ALJ's decision to select and review only medical evidence in accord with his conclusion, but includes the ALJ's failure to discuss *any* medical evidence to resolve the conflicting medical evidence, as ordered by the Appeals Council on remand of this matter by the District Court.

### Conclusion

The ALJ's June 2002 decision improperly relied, in part, on the previously vacated decision and on his recollections of testimony that is not part of the record. The decision also fails to resolve the conflicting medical evidence, and to establish Plaintiff's RFC with supportable evidence. Moreover, the ALJ's minimal analysis fails to carry his burden of building a logical and accurate bridge between the evidence presented and his decision denying benefits. Therefore, the Court is unable to examine Plaintiff's allegations that the ALJ has played doctor, has wrongly determined Plaintiff's ability to perform light work, and has made improper credibility assessments of Plaintiff. As the record shows conflicting testimony of medical opinions and indicates that more than one supportable decision could be made, the Court remands the case to the Commissioner for further proceedings consistent with this opinion and order. Upon remand, the Commissioner should consider whether the case should be assigned to a different ALJ.

It is THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment to Remand the Case be, and the same hereby is, GRANTED. IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment be, and the same hereby is, DENIED.

DATED: November 25, 2003          ENTER:

ARLANDER KEYS
United States Magistrate Judge